1   **WO**                                                                    SVK

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9   Randy Scott Bailey,                    )    No. CV 04-1175-PHX-MHM (MEA)
                                            )
10              Plaintiff,                  )    **ORDER**
                                            )
11  vs.                                     )
                                            )
12                                          )
    Fansler, C.O. III, et al,.              )
13                                          )
                Defendants.                 )
14                                          )
                                            )
15  _____)

16          Plaintiff Randy Scott Bailey filed this civil rights action under 42 U.S.C. § 1983.

17  (Doc. #4.)  Defendants Crabtree, Fansler, Gay, Luna, Perkins, Presson, and Shearer move for

18  summary judgment and Bailey cross-moves for summary judgment.[1]  (Doc. #81, 90.)  The

19  motions are ready for ruling.[2]  (Doc. ## 89, 92, 93.)

20          The Court will grant Defendants' motion, deny Plaintiff's motion and terminate the

21  action.

22  **I.      Background**

23          This case arises from events occurring on October 26, 2000, and Plaintiff's subsequent

24  reclassification and placement in maximum security custody.  Specifically, during an

25  attempted escape with two other inmates, Plaintiff put a metal shank to the throat of a

26  _____

27          [1]The Court issued a Notice pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir.
    1998) (*en banc*), informing Plaintiff of his obligation to respond.  (Doc. #83.)

28          [2]Plaintiff filed no Reply to his cross-motion.

correctional officer, tied her to a chair, and placed duct tape over her mouth; Plaintiff was ultimately convicted, pursuant to a plea bargain, of two counts of felony Kidnapping in connection with this event.  In his Second Amended Complaint Plaintiff alleged that his constitutional rights were violated by his initial placement in isolation on October 26, 2000; his reclassification hearings in June 2003, December 2003, and June 2004; and his appeals from those determinations.  Plaintiff sued Correctional Officer (CO) III Lisa Fansler, former Deputy Warden Conrad Luna, former Deputy Warden Danny Garvin, former Deputy Warden John Gay, CO III Barbara Shearer, former CO III Heather Presson, former Deputy Warden Madeleine Perkins, CO IV Maxwell, and Classification Manager Stacey Crabtree.[3] (Doc. #59.)  Plaintiff seeks injunctive relief, actual damages, exemplary damages and costs. (Id.)

Defendants move for summary judgment on the grounds that (1) Plaintiff had no liberty interest in his classification score or housing assignment; (2) Plaintiff cannot establish atypical hardship that would implicate due process rights; (3) if the Due Process Clause is implicated, Plaintiff received due process and there is some evidence supporting the placement; and (4) Defendants are entitled to qualified immunity.  They also argue that the statute of limitations bars claims arising before June 7, 2002.

Plaintiff responds and cross-moves on the grounds that (1) he pled guilty to two non-dangerous, non-repetitive Kidnapping charges, and the charges of escape, assaults on staff, and possession of a weapon were all dismissed pursuant to the plea agreement; (2) Plaintiff never received prison disciplinary charges or a hearing on the escape, assault, or weapons allegations, which are the basis of his classification level; (3) Plaintiff was denied a full and fair hearing on December 12, 2003, and Fansler did not properly account for Plaintiff's level-5 time to begin running for purposes of his eligibility for a score reduction; and (4) Defendants are not entitled to qualified immunity.

## II.   Legal Standards

### A.   Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents,

---

[3]Maxwell and Garvin have not been served.

viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading."  Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).  However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322-23.

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.

1    Anderson, 477 U.S. at 249.  The evidence of the non-movant is "to be believed, and all

2    justifiable inferences are to be drawn in his favor."  Id. at 255.  But, if the evidence of the

3    non-moving party is merely colorable or is not significantly probative, summary judgment

4    may be granted.  Id. at 249-50.

5            **B.    Due Process and Classification**

6            A prisoner has no constitutional right to enjoy a particular security classification.

7    Meachum v. Fano, 427 U.S. 215, 224-25 (1976) (no liberty interest protected by the Due

8    Process Clause is implicated in a prison's reclassification and transfer decisions).  See also,

9    Hewitt v. Helms, 459 U.S. 460, 466 (1983), overruled on other grounds by Sandin v. Conner,

10   515 U.S. 472,  482-83 (1995); Lucero v. Russell, 741 F.2d 1129 (9th Cir. 1984).  "As long

11   as the conditions or degree of confinement to which the prisoner is subjected is within the

12   sentence imposed upon him and is not otherwise violative of the Constitution, the Due

13   Process Clause does not in itself subject an inmate's treatment by prison authorities to

14   judicial oversight."  Montanye v. Haymes, 427 U.S. 236, 242 (1976).  But some placements

15   in maximum security custody may implicate liberty interests requiring due process

16   protections.  See Wilkinson v. Austin, 545 U.S. 209 (2005).

17           In analyzing a due process claim, the Court must first decide whether a plaintiff was

18   entitled to any process, and if so, whether he was denied any constitutionally-required

19   procedural safeguard.  Liberty interests that entitle an inmate to due process are "generally

20   limited to freedom from restraint which, while not exceeding the sentence in such an

21   unexpected manner as to give rise to protection by the Due Process Clause of its own force,

22   nonetheless imposes atypical and significant hardship on the inmate in relation to the

23   ordinary incidents of prison life."  Sandin, 515 U.S. at 484 (internal citations omitted).  To

24   determine whether an inmate is entitled to the procedural protections afforded by the Due

25   Process Clause, the Court must look to the particular restrictions imposed and ask whether

26   they "'present the type of atypical, significant deprivation in which a state might conceivably

27   create a liberty interest.'"  Mujahid v. Meyer, 59 F.3d 931, 932 (9th Cir. 1995) (quoting

28   Sandin, 515 U.S. at 486).

To determine whether the sanctions are atypical and significant hardships, courts look to the prisoner's conditions of confinement, the duration of the sanction, and whether the sanction will affect the duration of the prisoner's sentence.  See Keenan v. Hall, 83 F.3d 1083, 1088-89 (9th Cir. 1996). "Atypicality" requires not merely an empirical comparison but turns on the importance of the right taken away from the prisoner.  See Carlo v. City of Chino, 105 F.3d 493, 499 (9th Cir. 1997).  See, e.g., Sandin, 515 U.S. at 472 (30 days disciplinary segregation is not atypical and significant); Torres v. Fauver, 292 F.3d 141, 151 (3rd Cir. 2002) (four months in administrative segregation is not atypical and significant); Griffin v. Vaughn, 112 F.3d 703, 706-708 (3rd Cir.1997) (fifteen months administrative segregation is not atypical and significant); Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (six months of confinement in especially disgusting conditions that were "more burdensome than those imposed on the general prison population were not "atypical . . . in relation to the ordinary incidents of prison life."); Jones v. Baker, 155 F.3d 810 (6th Cir. 1998) (two and one-half years of administrative segregation is not atypical and significant).

**III.  Cross Motions for Summary Judgment**

**A.  Defendants' Motion**

In support of their motion, Defendants submit their Statement of Facts (Doc. #82, DSOF), the declaration of Crabtree (id. Ex. A, Crabtree Decl.); Department Order (DO) 801 Inmate Classification (id., Ex. A, Attach. 1, DO 801 Sept. 1, 1996; Attach. 3, DO 801 Mar. 3, 2001); ADC Offender Classification System (OCS) Classification Operating Manual (COM) (id., Attach. 2); Plaintiff's sentencing documents (id., Attach. 5); ADC investigation reports (id. Attach. 6); various Classification and Reclassification documents regarding Plaintiff (id., Attach. 9-37); and excerpts from Plaintiff's deposition (Pl. Dep. (Aug. 27, 2007)).

Crabtree attests that as a Correctional Administrator V, she supervises, among other matters, classification, and that she was formerly a Classification Manager. (Crabtree Decl. 2- 3.)  The inmate classification system and the process for the classification of inmates according to their individual security risk are outlined in DO 801. (DSOF ¶ 9; Crabtree Decl.

- 5 -

¶ 5.)  The process considers behavior and other objective, relevant factors.  (DSOF ¶ 10; Crabtree Decl. ¶ 6.)  Inmates are placed at the lowest custody level necessary to ensure the safety and security of persons, the institution, and the community and are placed at institutions that are consistent with their custody classification.  (Id.)

Under the 1996 and 2001 versions of DO 801, each inmate was rated on ten factors, including (1) the Public Risk (P) Score and (2) the Institutional Risk (I) Score.  (DSOF at ¶¶ 11-13, 34 .)  In determining a P score, ADC considered: (1) Severity of Current Offense; (2) Extent of Violence in Current Offense; (3) Weapon Use in Current Offense; (4) Escape History; (5) History of Violence; (6) Confinement History; (7) Estimated Length of Confinement; and (8) Detainer Status. (Crabtree Decl. ¶ 8, DO 801.01.)  To determine an I score, ADC considered: (1) Prior Institutional Adjustment; (2) Community Stability; (3) Inmate Adjustment during Initial Classification; (4) Probation/Parole Adjustment; (5) Mental Health Adjustment; (6) Current Age; (7) Gang Affiliation; and (8) Substance Abuse History.[4] (Id. ¶ 9.)

Under the ADC Classification Operating Manual (COM), institutions were rated using the P score and I score.  (DSOF ¶ 14.)  An institution rated at P-5/I-5 is the most secure, providing the highest level of inmate custody supervision, while an institution rated at P-1/I-1 is the least secure, providing only a minimal level of inmate supervision. (Id.) Using the P/I scores, ADC determined the appropriate institutional placement for each inmate. (Id.) Each newly committed inmate was rated.  (DSOF at ¶ 15.)

Under this system, the institutional classification staff reviewed an inmate's case approximately every 180 days using the same factors. (DSOF ¶ 16-17, Crabtree Decl. ¶ 12.) Each factor is scored from one to five and listed on the Reclassification Score Sheet ("RCSS").  (DSOF ¶ 18, Crabtree Decl. ¶ 14.)  The process balances the goal of reducing an inmate's scores based on improvement in behavior against the need to keep each inmate housed at an appropriate security level to minimize risk to ADC staff, other inmates, and the

---

[4]ADC's current classification system does not use the P/I scores, but instead evaluates inmates as maximum, close, medium or minimum custody. (Doc. #81, n. 3.)

public. (DSOF ¶¶ 19-20.)  An inmate with a P score of 5 must remain at that level for 2 years and have an I score of 3 or lower for 6 months before he is eligible for reduction of his P score to 4.  (DSOF ¶ 21, Crabtree Decl. ¶ 17.)  An inmate found guilty of a disciplinary violation for an assault on staff or an assault with a weapon would be classified to a P score of 5 and not be eligible for score reduction below P-4.  (DSOF ¶ 22, Crabtree Decl. ¶ 18, DO 801 p. 39.)

Reductions are also made to the I score based on a time table.  (DSOF ¶ 23.)  At 180 day intervals, each inmate's I score is reviewed to determine whether there should be an increase, decrease, or no change.  (Id., Crabtree Decl. ¶ 19.)  The factors considered are: (1) new information which would have changed any of the inmate's I score criteria ratings at initial classification; (2) disciplinary record since the last classification review; and (3) work/training/education/treatment (WTET) evaluation scores.  (Id.)

The inmate is notified of the review using the Institution Classification Referral Notice.  (DSOF ¶ 26, Crabtree Decl. ¶ 28.)  The inmate is allowed five days from the date of receipt to prepare for the hearing, but he can waive the period by signing the waiver on the Notice. (Id.)  Absent security concerns, the inmate can be present, make a statement, and present information to the Institutional Classification Committee (ICC) at his/her classification hearings.  (DSOF ¶ 27.)  The ICC makes a recommendation after examining relevant facts and circumstances.  (Id. ¶ 28.)  Classification "overrides" on P or I scores or facilities may be recommended if there are aggravating or mitigating circumstances. (Crabtree Decl. ¶ 27, Attach. 1, DO 801.06.)   The inmate is then verbally informed of the ICC's recommendation and asked to indicate agreement or disagreement with the recommendation. (Id.)

The ICC's written recommendation is forwarded to the Warden or Deputy Warden for

approval, denial, or modification.  (DSOF ¶ 29, Crabtree Decl. ¶ 28.)  The Warden or Deputy Warden's recommendation and supporting documentation are then forwarded to Central Classification for final approval, denial or modification.  (DSOF ¶ 30, Crabtree Decl. ¶ 26.)

An inmate has the right to appeal the final classification decision by the Central Classification Office to the Offender Services Bureau Administrator. (DSOF ¶ 33.) An inmate may only appeal the decision made by Central Classification. (Id., Crabtree Decl. ¶ 29.) To appeal, the inmate must submit an Inmate Letter within 15 work days. (Id.) The Offender Services Bureau Administrator's decision is final. (Id.)

On October 11, 2000, before the attempted escape incident, Plaintiff was reclassified as having a P/I score of 3/1, and he was housed at Arizona State Prison Complex ("ASPC") – Tucson, Santa Rita Unit. (DSOF ¶ 36.) His next 180-day reclassification was not due until April 2001. (Id. ¶ 42.)

On October 26, 2000, Plaintiff attempted to escape from prison. (DSOF ¶ 37, Crabtree Decl. ¶ 33.) He and two other inmates were working in an area supervised by a CO and a civilian contract worker. (Id.) Plaintiff grabbed the CO around the neck and stuck a metal shank up to her throat stating, "Don't let this turn into a murder." (Id.) Plaintiff took the CO's handcuffs and cuffed her to the chair and an accomplice took the victim's keys while Plaintiff took both her pepper spray and radio. (Id.) Plaintiff put duct tape over the victim's mouth. (Id.) Plaintiff left the room and when he returned, he had blood on him; he had had a confrontation with the civilian worker outside. (Id.) The CO reported Plaintiff was responsible for taking her hostage. (Id.) All three inmates were placed in lock down. Plaintiff admitted he organized the plan to escape. (Id., Ex. A Attach. 2 Presentence Report, Part One, p.2.)

ADC's Criminal Investigations Bureau investigated the attempted escape. (DSOF ¶ 38, Crabtree Decl. ¶ 34.) Plaintiff admitted that he had planned the escape and convinced the other two inmates to go with him because they had long sentences. (DSOF ¶ 39, Crabtree Decl. ¶ 34.) The plan involved stealing two cars, one to ram the old maintenance gate and the other to get away. (DSOF ¶ 39, Crabtree Decl. ¶ 35.) Plaintiff admitted that he had made 6 knives (shanks) and gave two to each of his accomplices. (Id.)

On October 26, 2000, Plaintiff was given notice and assigned to investigative

detention because of his conduct.[5]  (DSOF ¶ 40.)  On March 16, 2001, the State charged him with attempted escape, two counts of aggravated assault, two counts of Kidnapping and promoting prison contraband.  (Crabtree Decl. ¶ 37.)  On April 17, 2001, Plaintiff was served with an Institutional Classification Referral Notice for his regular 180-day reclassification.  (DSOF ¶ 32, Crabtree Decl. ¶ 38.)  He signed the form with "RTA," indicating his "refusal to attend."  (Id.)  After the reclassification hearing, ICC recommended that Plaintiff's P/I score remain at 3/1 and that his placement remain at SMU-I due to a facility override.  (DSOF ¶ 43, Crabtree Decl. ¶ 39.)  The recommendation was approved, and Plaintiff did not appeal.  (DSOF ¶ 43-44, Crabtree Decl. ¶ 40.)

In October, 2001, Plaintiff was reclassified again; he was present at the proceeding and asked the ICC to "Just make him a 5/5 now so [he] can get credit."[6]  (Crabtree Decl. ¶ 42.)  Plaintiff's scores remained the same, and he was approved to remain at SMU-I on a facility override.  (DSOF ¶¶ 45-47, Crabtree Decl. ¶ 42.)  On December 13, 2001, Plaintiff pled guilty to two charges of class 2 felony kidnaping.  (DSOF ¶ 44.)  Dismissal of the remaining charges was part of the plea agreement.  (Id.)  On January 14, 2002, Plaintiff was sentenced for the two counts of kidnapping.  (DSOF ¶ 49, Crabtree Decl. ¶ 45.)

On April 3, 2002, Plaintiff was referred for initial classification because he now had the new convictions.  (DSOF ¶ 50, Crabtree Decl. ¶ 45.)  The classification officer calculated a P score of 5 and an I score of 5.  (Id., Crabtree Decl. ¶ 46.)  The Classification Officer noted "P & I score justified per PSI depicting this incident took place during an escape attempt. All other scores justified per DI14 and previous scores." (Id.)  The Institutional Administrator approved the recommendation and assignment to SMU I. (Id.)  Central Classification approved the classification and noted that Plaintiff's score can not fall below

_____

[5]Plaintiff asserts in his Response that this was SMU-I, level 5 isolation.  (Doc. #89 at 3.)  This is consistent with Defendants' assertions that his classification reviews continued his placement at SMU-I.

[6]Apparently Plaintiff was seeking to run his P-5 score from the earliest date possible in order to get credit toward the 2-year period during which his P score was required to remain at 5.

4. (Id.)

On May 24, 2002, Plaintiff submitted an Inmate Letter to appeal his classification, disagreeing with the calculation of time he needed to spend at P-5, stating that "since I spent 18 months here [SMU I] pending the outcome of this case, I should get credit for all of it towards my 24 months here." (DSOF ¶ 51.) On June 17, 2002, Offender Services responded stating: "You were given a new hearing which set the date for your P-5 to start running at 20 days after date of sentencing. P-5 begins therefore on 1/30/02. Your next review to consider I score reduction is 7/28/02." (DSOF ¶ 52, Crabtree Decl. ¶ 49, Attach. 2, COM at 33.)

On June 10, 2002, Plaintiff was referred back to the ICC for a new initial hearing because not all of the needed documents had previously been provided. (DSOF ¶ 54, Crabtree Decl. ¶ 50.) He was again classified as P-5/I-5 and placed at SMU-I; a P score override was noted based on the attempted escape and an I score override was noted based on the assault. (DSOF ¶¶ 55-56, Crabtree Decl. ¶ 51.) Plaintiff initialed agreement. (Crabtree Decl. ¶ 51.) Plaintiff appealed the June 2002 classification. (DSOF ¶ 57.) Offender Services Bureau denied the appeal, stating: "As stated previously, you cannot be given credit for the two years prior to the new sentencing date of 1/11/02." (DSOF ¶ 58.)

Under the 2001 version of DO 801.03, initial classifications were to be reviewed within 60 days. (DSOF at ¶ 59.) On July 18, 2002, Plaintiff's initial classification was reviewed and his P/I score was reduced to 5/4; he was assigned to remain at SMU-I. (DSOF ¶ 60, Ex. A Attach. 22.) From January 2003 to December 2003, Plaintiff's P/I score was reduced to 5/3, 5/2, and then 5/1. (DSOF ¶¶ 61-67, Ex. A Attach. 23, 26, 29.) He appealed the January, July and December reclassifications, but his appeals were denied for failure to comply with proper appeal procedures. (Id.) During this period, Plaintiff's housing assignment remained SMU-I. (DSOF ¶¶ 61, 64, 70.)

At his June 2004, reclassification, ICC recommended reduction of Plaintiff's P/I score from 5/1 to 4/1 and that he should be placed at Florence Central Unit. (Id. ¶ 71.) On July 22, 2004, Plaintiff appealed, stating that there was no valid reason for ADC to use the attempted escape or assaults from the incident that occurred 3½ years ago at Tucson and for

which he was not convicted.  (DSOF ¶ 72, Crabtree Decl. ¶ 68.)  The Offender Services Bureau Administrator responded to the appeal, stating:

> You are approved for placement at the Central Unit in Florence as a facility override. This override is based upon the circumstances surrounding your current offense, which was a plea bargain to two counts of Felony Class 2 Kidnapping. Documented offense behavior involves the use of a weapon on a correctional officer in the Santa Rita Institution in October 2000 as part of a plan to escape from the Institution, which, according to the Presentence Investigation, you admit to organizing. Your scores and placement will continue to be reviewed at each 180 day review.

(DSOF ¶ 73, Crabtree Decl. ¶ 69.)

At Plaintiff's December 2004 reclassification, ICC recommended that his P/I score remain at 4/1 and that he should remain at Florence Central Unit due to his escape history, and Plaintiff appealed.  (DSOF ¶ 74-75.)  Crabtree responded stating:

> Your placement at the Central Unit in Florence is approved as a facility override. Your documented offense behavior involves the use of a weapon on a Correctional Officer in the Tucson/Santa Rita Unit in October, 2000 as part of a plan to escape from the institution. You have admitted to organizing this escape. This behavior represents a higher level of Public Risk, and a higher level of security placement is indicated. Your scores and placement will continue to be reviewed at each 180 day review.

(DSOF ¶ 76, Crabtree Decl. ¶ 72.)

Defendants argue that Plaintiff has no constitutional right to a particular classification status, and he does not establish atypical hardships implicating due process.  They argue that although Plaintiff alleged that his placement in isolation affected him mentally and physically, in that he gained weight, his eyes are now "bad" and he suffers from depression and memory loss, he does not demonstrate how those injuries constitute atypical hardships. He admitted that he received regular meals, had recreation and showers three times per week, used and possessed certain appliances (TV and radio) and had opportunities for weekly visits.

They also argue that even if due process is implicated, Plaintiff received notice and an opportunity to be heard, as required by Wilkinson.  Moreover, the placement in maximum custody was supported by "some evidence in the record."  Doern v. Beebee, 145 F.3d 1337, (9th Cir. 1998) citing Superintendent v. Hill, 472 U.S. 445, 454 (1985).  Plaintiff admitted his role in planning and executing the escape attempt, including providing weapons and taking a correctional officer hostage.  They assert that the charges to which Plaintiff pled

1  guilty are not the only evidence considered and dismissed charges are only disregarded when

2  they are not part of the plea agreement.

3       **B.    Plaintiff's Response and Cross-Motion**

4       In support of his response and cross-motion, Plaintiff submits his Statement of Facts

5  (Doc. #91, PSOF), his declaration (<u>id.</u>, Pl. Decl.), and various classification documents.

6       Plaintiff asserts that he was told by CO III Bock that the staff decided not to charge

7  him with a disciplinary violation for the October 2000 incident but to hold him until the state

8  case was over so that his P-5 score would start then.  (PSOF ¶¶ 2, 7.)  Plaintiff pled guilty to

9  only two counts and the other charges were dismissed.  (<u>Id.</u> ¶ 8.)  At the June 10, 2001

10 hearing, Plaintiff brought a written statement and plea agreement, but the agreement was not

11 included in the hearing record.  (<u>Id.</u> ¶10.)  He argues that the June 10, 2002 reclassification

12 documents came back from Central Office noting there was no conviction for escape and

13 lowering the 5 score to 4.  (<u>Id.</u> ¶¶ 11, Doc. # 83, Attach. 18.)  Plaintiff contends that he was

14 reclassified from 5/5 to 5/4 on July 18, 2002, without improper consideration of the

15 dismissed charges.  (<u>Id.</u> ¶ 12, Doc. #83, Attach 22.)  On January 14, 2003, Plaintiff was

16 reclassified from 5/4 to 5/3 and was recommended for Central Unit but this was denied, so

17 Plaintiff appealed.  (<u>Id.</u> ¶¶ 13-14, Doc. #83, Attachs. 24 and 25.)  On June 28 2003, Plaintiff

18 was reclassified to 5/2, again recommended for Central Unit, and then denied.  (<u>Id.</u> ¶ 15, Doc.

19 #83, Attachs. 26-28.)

20      Plaintiff also asserts that at the December 2003 reclassification, Fansler miscalculated

21 the P-5 score time and did not drop it to a P-4 at the fourth 180 day review.  (<u>Id.</u> ¶ 17.)

22 Plaintiff argues that he was denied a fair reclassification hearing because he was not given

23 the right to submit a written statement or proof that the December 12 reclassification was the

24 fourth 180 day review and that the two years of P-5 status started January 2002, with the June

25 2002 initial reclassification.  (<u>Id.</u> ¶ 18.)  Plaintiff asserts that he filed an appeal that was

26 forwarded without appeal numbers, and so it was returned unprocessed.  (<u>Id.</u> ¶ 19.)  He

27 further alleges he was denied three appeals in a row by the failure of Fansler and Schearer

28 to log appeal numbers.  (<u>Id.</u> ¶ 20.)

1    Plaintiff submitted a written statement at his June 15, 2004 reclassification regarding

2    the dismissed charges, which were then being used in lieu of disciplinary findings, and he

3    appealed.    (Id. ¶ 21.)    Central Office did not respond before Plaintiff again had a

4    reclassification hearing. (Id. ¶ 22.) Plaintiff submitted the plea agreement at his December

5    28, 2004 hearing.  On March 2, 2004, CO III Russell confirmed that ADC had erred in

6    calculating Plaintiff's P score from June 10, 2004 rather than January 2004. (Id. ¶ 26, Doc.

7    #91, Ex. E.)

8    Plaintiff also argues that he is manic depressive and had been cut off from his

9    medication about a year before the October 2000 incident and believes the impairment is a

10   mitigating factor, as is ADC's refusal to treat his mental illness.  (Id. ¶ 31.)

11   Plaintiff objects to several of Defendants' documents; specifically Attachments 14-16

12   and the arguments made in reliance on them.   He asserts that Attachments 14-16 are

13   documents voided by the subsequent Initial Reclassification, which was done to correct

14   errors; those new documents are Attachments 17 and 18. He asks the Court to strike

15   Attachments 14-16 and the Statements of Fact and Crabtree Declaration paragraphs based

16   on the Attachments.

17   Plaintiff argues that he has a liberty interest protected by due process because isolation

18   is atypical and a significant hardship.  (Doc. #90.)

19       **C.    Defendants' Response and Reply**

20   Defendants object to Plaintiff's failure to dispute specific portions of their Statement

21   of Facts.  They also object to specific paragraphs of Plaintiff's Separate Statement of Facts

22   and declaration.  They reassert their argument that placement in maximum custody did not

23   constitute atypical hardship, and therefore, Plaintiff was not entitled to due process. (Doc.

24   #92, 93.)

25       **D.    Analysis**

26           **1.    Statute of Limitations**

27   A court applies state law to determine who has the burden of proof as to the statute

28   of limitations. See Carvalho v. Raybestos-Manhattan, Inc., 794 F2d 454, 457 (9th Cir. 1986).

1   Under Arizona law, the statute of limitations is an affirmative defense to be pleaded and

2   proved by the defendant.  Kerwin v. Bank of Douglas,  379 P. 2d 978, 981 (Ariz. 1963).

3       In § 1983 actions, the applicable statute of limitations is the forum state's statute of

4   limitations for personal injury actions.  Owens v. Okure, 488 U.S. 235, 249-50 (1989).

5   Arizona's limitation period for personal injury actions is two years.  Ariz. Rev. Stat. § 12-

6   542(1).  Defendants argue that because Plaintiff filed his Complaint on June 7, 2004, all

7   claims arising before June 7, 2002 are time barred.

8       Plaintiff argues that he had to know that the staff was deliberately violating his rights,

9   so until they documented their actions, Plaintiff had no action to bring.  He asserts that the

10  statute of limitations only came into play as of the June 2002 Initial Reclassification and

11  Appeal Response.  (Doc. #89 at 7.)

12      The Court finds that to the extent that the Second Amended Complaint raises claims

13  regarding Plaintiff's initial placement in investigative detention and reclassification hearings

14  prior to June 2002, they are time barred.  Plaintiff certainly had notice of his placement in

15  maximum security and the procedures used to assign him to maximum security.  See Knox

16  v. Davis, 260 F.3d 1009, 1014 (9th Cir. 2001).  However, it does not appear from Plaintiff's

17  response and cross-motion that he is, in fact, challenging determinations prior to June 2002.

18      Under the "prison mailbox rule," a complaint is deemed "filed" when handed by the

19  prisoner to a prison official for mailing.  See Houston v. Lack, 487 U.S. 266, 270-71 (1988);

20  Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003).  Plaintiff's Complaint is dated

21  June 1, 2004  and under the mailbox rule, that is the date of filing.  Claims prior to June 2002

22  are barred by the statute of limitations.

23      **2.    Due Process**

24          **a.    Atypical and Significant Hardship Implicating a Liberty Interest**

25      The Court finds that pursuant to Wilkinson, the undisputed evidence shows that

26  Plaintiff's continued placement in maximum custody for an indefinite period, in fact,

27  constituted atypical or significant hardship relative to the ordinary incidents of prison life.

28      In Wilkinson, the Supreme Court noted that following Sandin, Courts of Appeals had

not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant.  545 U.S. at 223.  It also noted that the divergence "indicates the difficulty of locating the appropriate baseline . . ." but that it need not resolve the issue in Wilkinson.  Id.  In Wilkinson, the Court held that inmates had a liberty interest protected by the Due Process Clause in avoiding assignment to the Ohio supermax prison; those facilities were designed to segregate the most dangerous prisoners from the general population, and the conditions were highly restrictive.  Id. at 213.  Conditions at the Ohio facility under consideration in Wilkinson were more restrictive than death row or the administrative control units.  Id. at 214.  Inmates remained in their 7 x 14 foot cells 23 hours-per-day; a light remained on at all times, although it was dimmed; and during the one hour-per-day that the inmate could leave his cell, access was limited to one of two recreation areas.  Id. Conversation was not permitted from cell to cell; the placement was indefinite, and after the initial review, it was reviewed only annually; and placement disqualified an otherwise eligible inmate from parole consideration.  Id. at 223-24.

The Court reasoned that, but for the especially severe limitation on all human contact, the conditions would apply to most solitary confinement facilities but there were two additional factors.  The first was duration; placement was indefinite and after that reviewed only annually.  Second, placement disqualified an inmate for parole- eligibility consideration. Id.  at 224.

Although the evidence here is sparce, the undisputed record shows that Plaintiff was in lockdown; he did not see other inmates unless he went to the shower or recreation and he could not talk to them at those times (Doc. #82, Ex. B Pl. Dep.17:19-25); he received recreation and a shower only three times per week (id. 18:1-13); lighting was on 24 hours per day, although it was lowered at night (id. 19:1-7); meals were in the cell (id., 19:111-13); he was allowed one visit per week (id., 20:23-24); and the cells were approximately 6 x 13 (id., 24:13-18).[7]   These conditions are substantially the same as those in Wilkinson.  It is also

_____

[7]This is a description of the cells at Central Unit; there is apparently no evidence in the record of the size of the cells in maximum custody.

- 15 -

1   undisputed that Plaintiff's placement was not for a fixed period of time; rather, it was

2   indefinite.  Indeed, Plaintiff was in maximum-security custody from October 2000 until at

3   least June 2004.  (DSOF ¶ 70.) Although Plaintiff does not contend that the placement

4   resulted in a longer sentence than he would otherwise serve or a loss of parole eligibility, the

5   Court finds that the harsh conditions coupled with the indefinite period of confinement in

6   those conditions created a liberty interest protected by due process.

7                  **b.    Due Process Protections Provided to Plaintiff**

8           Next the Court must determine if Plaintiff received appropriate due process

9   protections.  Wilkinson provides guidance regarding what procedures are required. 545 U.S.

10  209.

11          Prison procedures under consideration in Wilkinson provided that the inmate receive

12  notice of the factual basis leading to consideration for supermax placement at least 48 hours

13  before the hearing and an opportunity for rebuttal at a hearing at which he could offer

14  pertinent information and an explanation or objections to the placement.  Id., at 216, 225.

15  Inmates were not permitted to call witnesses.  Id. at 228.  If the Classification Committee

16  holding the hearing did not recommend placement, the process would terminate.  Id. at 216.

17  If it did recommend placement, it would document the decision, setting out the nature of the

18  threat and the reasons for the recommendation and forward the materials to the warden.  Id.

19  at 217.  If the warden disagreed, the process terminated.  If the warden agreed, he indicated

20  his approval and reasons and forwarded the materials to the Bureau of Classification for a

21  final decision.  If a recommendation was for supermax placement, the decision maker was

22  required to provide a short statement of reasons.  Id. at 226. The inmate was entitled to

23  receive another review within 30 days; after that, placement would be reviewed at least

24  annually according to the initial three-tier classification review process.  Id. at 217, 226.  The

25  Supreme Court found these due process protections adequate.  Id. at 255.

26          Here, the record shows that the process provided that Plaintiff receive a notice of the

27  classification hearing at least five days before the scheduled hearing, that Plaintiff could be

28  present and submit a statement, and that Plaintiff could appeal.  It appears that the initial

procedures provided by ADC are almost identical to those approved by the Supreme Court in Wilkinson, with the added protection of the ability to call witnesses.

As to Plaintiff's complaint that Defendants used the escape, assault, and weapons conduct without a disciplinary hearing, the COM provides that in determining the P score, the severity of the offense is determined by the documented *offense behavior* of the most severe offenses for which the inmate is sentenced. (Doc. # 82, Ex. A, Attach. 2.) The COM explains that for example, "if the inmate's actual offense behavior (according to a presentence report or other authorized document) depicts an Armed Robbery (Class 2 Felony), but the inmate pled guilty to simple Robbery (Class 3 Felony) the Classification Officer would assign a rating for the more serious offense depicted by actual behavior." (Id.) In other words, the language does not limit ADC to consideration of only crimes of conviction nor does it require separate disciplinary charges. The COM provides that the I score is determined using the same method. (Id. at 19.) The COM also provides that when a new initial classification is necessary to change an inmate's scores because of new convictions after the inmate is already in ADC custody, "the inmate's scores shall be effective as of twenty (20) days following the inmate's date of sentencing." (Id. at 33.)

In Plaintiff's case, the presentence report established that Plaintiff's conduct included attempted escape, assault of an officer, and use of a weapon. (Doc. #82, Ex. 5.) Indeed, Plaintiff does not deny this conduct but argues that the plea bargain precludes its use. But neither the Due Process Clause nor the ADC classification procedures support Plaintiff's argument. Due process does not require prison officials to ignore relevant, admitted conduct—such as attempted escape, assault of a correctional officer, and use of a weapon—when determining an inmate's appropriate custody classification, even if Plaintiff received favorable treatment in the form of a plea bargain in his criminal case.[8] "In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the

---

[8]Although Plaintiff argues that the June 2002 Classification proceeding assigned him a P score of 4, in fact, the record shows that Central Classification approved a 5/5 score for Plaintiff based on the attempted escape and assault. (Doc. #82, Attach. 18.)

safety of [others] . . . even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents.  The judgment of prison officials in this context, like that of those making parole decisions, turns largely on 'purely subjective evaluations and on predictions of future behavior.'"  Hewitt, 459 U.S. at 474 (internal citations omitted), overruled on other grounds by Sandin, 515 U.S. at 482-83.

Furthermore, the Due Process Clause does not require that Plaintiff receive "credit for time served" in maximum custody; in other words, running the 2-year-eligibility period for a P-score reduction from the date of sentencing—January 2002—rather than from Plaintiff's initial placement in maximum custody, does not violate due process.[9]  And to the extent Plaintiff complains that his time was mistakenly calculated from June 2002, the claim is based on violation of an ADC procedure, which is not cognizable under § 1983.  See Ybarra v. Bastian, 647 F.2d 891, 892 (9th Cir. 1981) (§ 1983 does not provide a cause of action for violations of state law or state constitutional rights).

But Plaintiff demonstrates that when the ICC did *not* recommend maximum-custody placement at its 2003 reviews, the process did not terminate; the final reviewer denied the recommendation to a lesser-custody placement and again assigned Plaintiff to maximum custody.  Specifically, at the January 14, 2003 review, the ICC recommended reduction to 5/3 and an A01 placement.  (Doc. #82, Ex. A, Attach. 23.)  Likewise, the reviewing Institutional Administrator approved the recommendation on January 15, 2003.  (Id.)  But Central Classification denied the institutional assignment and placed Plaintiff in an A08 institution.  (Id.)  Under "comments," Central Classification noted "DT08 10 F/O/R."  (Id.)  Plaintiff asserts and Defendants do not dispute that the ICC and Institutional Administrator recommendations were for Central Unit, a less restrictive placement.[10]  (Doc. #91, PSOF ¶¶ 14-15; Doc. #82, Ex. A Attach. 24.)  Again in June 2003, the ICC recommended an A01

---

[9]Moreover, this claim appears to be time barred.

[10]Defendants do not object to PSOF ¶ 15.

placement, which was approved by the Institutional Administrator but denied by Central Classification.  (Doc. #82, Ex. A Attach. 26.)  This time, no reason was given.  (Id.)

In Wilkinson, the Supreme Court noted the importance of Ohio's procedural rule that prevented a subsequent reviewer from overturning a determination *not* to place the inmate in the supermax facility. 545 U.S. at 226.  The Court stated that this prohibition avoided one of the problems encountered under the former policy, where even if two levels of reviewers recommended against placement, a later reviewer could overturn their recommendation without explanation.  Id.  In addition, the Court reasoned that the requirement of the decisionmaker to provide a short statement of reasons would guard against arbitrary decision making while also providing the inmate a basis of objection before the next decisionmaker or in a subsequent review.  Id.

Although the Supreme Court did not require the Ohio procedure in question, it clearly found a problem with the former procedures that permitted a subsequent reviewer, without explanation, to order placement in the supermax when it had not been recommended by others.  In Wilkinson, the Court applied a Mathews v. Eldridge, 424 U.S. 319 (1976), and its balancing test to determine the adequacy of the procedures in question.  Id. at 224-28.  The Mathews test requires consideration of (1) the private interest that will be affected by official action; (2) the risk of erroneous deprivation of the interest through the procedures used; and the probable value, if any of additional procedures; and (3) the government's interest, including function and fiscal and administrative burdens that additional procedures would require.  Mathews, 424 U.S. at 335.

In Wilkinson, the Court held that the private interest at stake—liberty—must be evaluated in the context of a prison system and its natural curtailment of liberties.  Wilkinson, 545 U.S. at 225.  As to the risk of erroneous placement under the procedures in use, the Court noted that the requirement to provide a brief summary of the factual basis for classification review and allowing the inmate rebuttal would safeguard against an insufficient reason.  Id. at 226.  The Court also noted the importance of avoiding a situation where two levels of reviewers recommended against maximum custody placement and the final reviewer

1    overturned the recommendation without explanation. <u>Id.</u> The final factor is the State's

2    interest; the Court found that the State's interest in prison management was a "dominant"

3    consideration, and it recognized the importance of both prison security and scarce resources.

4    <u>Id.</u> at 227-28. The Court rejected an argument that witnesses or other aspects of an adversarial

5    hearing were required. <u>Id.</u>

6          Applying the <u>Mathews</u> factors, this Court finds that a risk of erroneous deprivation of

7    a liberty interest occurs when ADC officials are permitted to review and overturn, without

8    explanation, recommendations *against* placement in maximum custody. <u>See id.</u> at 226.

9    Furthermore, additional procedures—at the very least requiring the reviewing official to

10   provide reasons for denial of the recommendation to lower custody—would reduce the risk

11   of erroneous placement without compromising the prison's objectives of security and

12   conserving resources. Therefore, in view of the lack of explanation for the determinations in

13   this case, Central Classification's 2003 reversals of the ICC recommendation for placement

14   in a lower custody unit violated Plaintiff's right to due process.

15         In addition, Plaintiff complained that some of his appeals were not processed. The

16   record shows that Plaintiff submitted an Inmate Letter to the Central Classification Officer,

17   dated February 22, 2003, appealing the February 2003 denial of his classification

18   recommendation to A01. (Doc. #82, Ex. A, Attach. 24.) The ADC Response indicates that

19   classification appeals must be submitted by following the procedures in 801.08; no additional

20   explanation was provided. The pre-printed form indicates that classification appeals must be

21   submitted through the designated unit classification officer (CO III/CO IV.) (<u>Id.</u>, Attach. 25.)

22   Likewise, Plaintiff submitted an Inmate Letter to "CO IV to go to Central Office," dated

23   August 12, 2003, appealing the July 28 denial of his classification recommendation to A01.

24   (<u>Id.</u>, Attach. 27.) Again, the Response was to submit the appeal pursuant to 801.08, and again,

25   no additional explanation was provided. (<u>Id.</u>, Attach. 28.)

26         The section of DO 801 addressing hearings and appeals is not attached to Defendants'

27   motion. Plaintiff's 2003 appeals appear to be directed to the proper official and also use

28   substantially the same process that Plaintiff used to appeal his April 2002 classification; the

1  Court notes that the 2002 appeal was processed.  (Id., Attachs 15, 16.)  The Court finds that

2  Plaintiff has demonstrated that Defendants failed to respond to two of his classification

3  appeals.  But the Court need not determine whether due process requires an appeal in addition

4  to other levels of review because, as discussed below, the Court finds that Defendants are

5  entitled to qualified immunity regarding due process violations.

6                              **2.   Qualified Immunity**

7          A defendant in a § 1983 action is entitled to qualified immunity from damages for civil

8  liability if his conduct does not violate clearly established statutory or constitutional rights of

9  which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818

10 (1982).  In a qualified immunity analysis, the court must make two distinct inquires, the

11 "constitutional inquiry" and the "qualified immunity inquiry."  See Estate of Ford v. Ramirez-

12 Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  The "constitutional inquiry" asks whether,

13 when taken in the light most favorable to the non-moving party, the facts alleged show that

14 the official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201

15 (2001).  If so, a court turns to the "qualified immunity inquiry" and asks if the right was

16 clearly established at the relevant time.  Id. at 201-02.  This second inquiry "must be

17 undertaken in light of the specific context of the case, not as a broad general proposition."

18 Id. at 201.

19         The second step of the Saucier analysis looks at whether the right to due process for

20 classification to a maximum-security-custody level following commission of another crime

21 was clearly established law during the time period in question.  A right is clearly established

22 if its contours are "sufficiently clear that a reasonable official would understand that what he

23 is doing violates that right."  Kennedy v. City of Ridgefield, 439 F.3d 1055, 1065 (9th Cir.

24 2006) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  It is not necessary that there be

25 a prior case with the identical facts showing that a right is clearly established; it is enough that

26 there is pre-existing law that provides a defendant "fair warning" that his conduct was

27 unlawful.  Kennedy, 439 F.3d at 1065.  On the other hand, "in the light of pre-existing law

28 the unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

1        The relevant inquiry in determining whether the right violated was clearly established

2  is whether it would be clear to reasonable prison officials that their conduct was unlawful in

3  the situation presented.  <u>Saucier</u>, 533 U.S. at 202.  At the time of the incident, it was

4  established that liberty interests that would entitle an inmate to due process were limited to

5  restrictive conditions that impose atypical and significant hardship on the inmate in relation

6  to the ordinary incidents of prison life.  <u>Sandin</u>, 515 U.S. at 484.  But <u>Sandin</u> involved

7  disciplinary segregation for misconduct; it did not address reclassification based on a new

8  conviction for a crime committed while in prison.  In addition, the Supreme Court had held

9  that a prisoner has no constitutional right to enjoy a particular security classification and that

10  no liberty interest protected by the Due Process Clause is implicated in a prison's

11  reclassification and transfer decisions.  <u>Meachum v. Fano</u>, 427 U.S. 215, 224-25 (1976).

12  <u>Wilkinson</u> was not decided until June 13, 2005—after the events under consideration here.

13  545 U.S. at 209.

14        In his due process analysis, Plaintiff cites <u>Koch v. Lewis</u>, 216 F. Supp. 2d 994, 1001

15  (D. Ariz. 2001); not only was Koch vacated, <u>Koch v. Schriro</u>, 399 F.3d 1099 (9th Cir. 2005),

16  but it involved indefinite detention based on alleged prison gang membership, not convictions

17  for crimes committed subsequent to imprisonment or admitted conduct in connection with

18  those crimes.  Plaintiff also argues that Defendants played a "shell game" by bootstrapping

19  dismissed charges into the record "under the guise of a 'finding of guilt in [a] disciplinary'"

20  hearing but not holding such a hearing.  (Doc. #89 at 11.)  But Plaintiff had admitted to the

21  additional conduct, and there was a finding to that effect in the pre-sentence report.

22        The Court also notes that <u>Wilkinson</u> recognized that Courts of Appeals had not reached

23  consistent conclusions regarding the baseline for  application of <u>Sandin</u> to determine what is

24  atypical and significant, and <u>Wilkinson</u> itself did not resolve the issue.   <u>Id.</u> at 223.

25  Additionally, one of the significant factors relied on in <u>Sandin</u> and <u>Wilkinson</u> to determine

26  atypical and significant hardship—a negative effect on the inmate's sentence—is not present

27  here.  As the Seventh Circuit noted in <u>Wagner v. Hanks</u>, 128 F.3d 1173, 1176 (7th Cir. 1997),

28  when discipline takes the form of prolonging incarceration or otherwise depriving a prisoner

of what has been held to be liberty or property, it is actionable. "But when the entire sanction is confinement in disciplinary segregation for a period not exceeding the remaining term of the prisoner's incarceration, it is difficult to see how after <u>Sandin</u> it can be made the basis of a suit complaining about a deprivation of liberty." <u>Id.</u>

Because the Court finds that the right to due process for classification in maximum custody following conviction for a new crime was not clearly established at the time of the events considered in this matter, Defendants acted reasonably and are entitled to qualified immunity on the claims for damages. <u>See</u> <u>Hydrick v. Hunter</u>, 500 F.3d 978, 988 (9th Cir. 2007).

**IV.    Injunctive Relief**

Qualified immunity is immunity from a suit for damages, not immunity from suit for injunctive relief. <u>Id.</u> at 988. In addition to damages, Plaintiff's Second Amended Complaint seeks an injunction to expunge from Plaintiff's file "all references of attempted escape, assaults upon officers, weapons and/or any other non-adjudicated allegations from the event of October 26, 2000," reclassification to the level of custody to which he is entitled, and immediate transfer to that custody level. Plaintiff also seeks an order enjoining retaliation or harassment due to the case or events leading up to it. (Doc. #59 at "Request for Relief.")

The underlying claim here is for due process. <u>Wilkinson</u> provides guidance for determining the appropriate procedures to follow when classifying an inmate for placement into maximum security unrelated to disciplinary charges, but neither <u>Wilkinson</u> nor the Due Process Clause prohibit use of criminal offense behavior nor mandate an outcome to a classification procedure. The Court is without authority to order expungement of relevant offense behavior or to order reclassification of Plaintiff to the custody level to which he thinks he is entitled. Moreover, claims of retaliation and harassment are beyond the scope of the Second Amended Complaint. Because Plaintiff has requested no injunctive relief to which he is entitled, the Court will dismiss the claims for injunctive relief.

**V.    Unserved Defendants**

On March 7, 2007, the screening Order for Plaintiff's Second Amended Complaint

- 23 -

ordered service on Maxwell and Gavin.  The summons for Maxwell was returned unexecuted on April 4, 2007; the summons for Gavin was returned unexecuted on April 18, 2007.  In light of the Court's determination on Defendants' summary judgment motion, the claims against these two Defendants will be dismissed.

Because no claims and no Defendants remain, the Court will terminate the action.

**IT IS ORDERED:**

(1)  The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. #81) and Plaintiff's Motion for Summary Judgment (Doc. #90).

(2)  Defendants' Motion for Summary Judgment (Doc. #81) is **granted**, and Plaintiff's Motion for Summary Judgment (Doc. #90) is **denied**.

(3)  The action is terminated, and the Clerk of Court must enter judgment accordingly.

DATED this 15th day of January, 2009.

Mary H. Murguia
United States District Judge